UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                               )
UNITED STATES OF AMERICA       )
                               )
          v.                   )  CRIMINAL NO. 07-10050-PBS
                               )
DIEP VAN NGUYEN,               )
          Defendant.           )
_____)
```

**MEMORANDUM AND ORDER**

February 7, 2008

Saris, U.S.D.J.

**<u>INTRODUCTION</u>**

Defendant Diep Van Nguyen, charged with drug trafficking and unlawful possession of a gun, has moved to suppress evidence seized from his residence pursuant to a search warrant.  The defendant contends that the search warrant resulted from an illegal warrantless search of the premises.[1]  At a hearing on January 10, 2008, police officer and DEA Task Force Officer Joao Monteiro, FBI agent and Boston SWAT team member Timothy J. Quinn, FBI agent Brad Carpenter, and Steven Lopes with the Massachusetts State Police, testified.  The motion is **<u>DENIED</u>**.

---

[1] Defendant also initially sought a Franks hearing, but has not pressed a Franks claim.

## I.  **FINDINGS OF FACT**

### 1.  **The Arrest**

On February 1, 2007, the defendant Diep Van Nguyen was
indicted on methamphetamine and ecstasy charges arising out of a
single investigation involving 23 defendants.  The next day, on
February 2, 2007, a Boston SWAT team of about 20 agents arrived
at 34 Harris Street to execute an arrest warrant for the
defendant at approximately 6:00 a.m.  From their pre-operation
briefing the day before, the agents believed that defendant was
an "armed and dangerous" felon with convictions for assault and
battery on a police officer, among other things.

Defendant lived in 34 Harris Street with his girlfriend,
Phuong "Alexis" Nguyen; relatives of the defendant lived in 36
Harris Street.  34 and 36 Harris Street are side-by-side halves
of a two family house; they share a common front porch but have
separate entry-ways.  Upon arriving, the SWAT team split into two
groups, guarding the side and front doors of 34 Harris.  In
response to the agents' knock and announce at the front door,
Alexis Nguyen answered and was escorted away from the building by
the agents.  However, the defendant did not appear.

After approximately two minutes, the agents attempted to
force their entry by the side door with a battering ram.  The
battering ram could not open the door so they switched to chain
saws and cut a hole through the door.  Once inside, they saw that
the door had been fortified with a two-by-four, and bolted by

2

brackets into the frame of the house; later on, the agents observed similar fortifications on the front door.  Approximately four or five minutes after first announcing their presence, the agents entered and arrested the defendant in a second floor bedroom.  He was handcuffed, brought into the living room, and handed off to another squad for transport.

After arresting the defendant, the SWAT team immediately began a protective sweep for any other people in the apartment. In the living room on the first floor, when Agent Quinn began to move a large couch away from the wall, he observed a scale in plain view in a cabinet built into the wall with closed glass doors.  Based on his experience and his knowledge that the defendant was being arrested on a drug warrant, Agent Quinn concluded that the scale could be used for narcotics.  The agent left the scale in its place and the doors closed, but reported his findings by telephone to another agent in charge of the investigation.  The protective sweep took approximately five minutes.  The house was secured sometime between 6:30 am and 7:00 am, pending a search warrant for the residence.

During the arrest of the defendant in the second floor bedroom, and the initial protective sweep, one or more of the SWAT team members observed a staircase to an attic inside a bedroom closet, but did not go upstairs.  There was a barricade at the top of the stairs, but the officers were not certain how secure it was.

3

**2.  The Freeze**

After the arrest and protective sweep, the SWAT team turned
over the premises to a separate team headed by Agent Carpenter of
the FBI.  Agent Carpenter went inside of 36 Harris Street, where
he observed Alexis Nguyen with two to four other adults and
several children.  Several agents were inside 36 Harris Street,
getting the identification of the individuals.  Alexis informed
Agent Carpenter that these residents of 36 Harris Street were
members of the defendant's family.

Agent Carpenter and other agents asked Alexis Nguyen for
consent to search 34 Harris Street.  She refused.  The agents
next informed her that they were going to secure the premises
while applying for a search warrant, and she was permitted to
enter 34 Harris Street with a police escort to get clothes.  The
agents then asked Alexis to wait next door and took positions
outside the house in view of both the front and side doors.

About four or five hours after "freezing" the apartment,
while awaiting the search warrant, Agent Carpenter received a
call from a SWAT team member who had observed the closet
staircase to the attic.  Agent Carpenter and others became
concerned that 34 Harris Street might be accessible from a common
attic shared with 36 Harris Street.  Two or three state troopers
were positioned at the top of the stairs to the second floor, in
sight of the attic stairs in the bedroom, and the bathroom.
While at this position, Trooper Lopes observed a round of

4

ammunition on the bathroom floor near the tub.  There was another
round on the rim of the tub.  The bathroom window was open.  That
February day was very cold, approximately 20 degrees Fahrenheit.
Trooper Lopes alerted Agent Carpenter, who proceeded upstairs.
Upon observing the open window and the ammunition, Agent
Carpenter suspected that the defendant had thrown a gun out the
window.  After the discovery of the ammunition, Agent Carpenter
went outside to the driveway area to check for a weapon.  He saw
a handgun and more ammunition on the roof above the back door,
directly adjacent to the driveway.  He also observed more
ammunition in the driveway.[2]  Agent Carpenter asked Alexis Nguyen
who owned the gun on the roof, but she declined to answer and
asked to speak to her lawyer.  The agents maintained the freeze,
but did not seize the gun or ammunition until the warrant
arrived.

   3.   **The Search and Seizure**

     Shortly before 2:00 pm, a search warrant signed by
Magistrate Judge Joyce Alexander arrived at the scene and agents
commenced their search, which ended at about 5:00 pm.  In
addition to the scale, the handgun and the ammunition, they
seized assorted documents including vehicle titles, nine cellular
telephones, assorted telephone cards, sandwich bags, a vacuum

---

[2] The magazine and two additional rounds of ammunition had rolled
into the gutter, but Carpenter could not see them from the
ground.  They were discovered when the search warrant was
executed.

sealer, another scale and bowl, and a glass pipe.  The 9mm
handgun and ammunition recovered in the search form the basis for
a charge of felon in possession in violation of 18 U.S.C.
§922(g)(1).

### 4.  <u>The Search Warrant Affidavit</u>

DEA Task Force Officer Monteiro swore out the affidavit for
searches of five locations, including 34 Harris Street, on
February 2, 2007.  Monteiro did not personally take part in any
of the arrests or searches; instead, he received information at
the U.S. Attorney's Office from numerous teams of agents.  He
assembled the information from five of these teams into his
affidavit, which he presented to Judge Alexander.  Paragraph 14
of the affidavit reads in part, "During a protective sweep of the
premises, through a glass cabinet [agents] observed a scale."  As
Monteiro explained in his affidavit, scales were frequently used
by drug dealers to package drugs.  Paragraph 14 continues, "On
the roof next to the bathroom, they observed in plain view a .9
millimeter handgun and saw ammunition on the bathroom floor."

## II.  <u>CONCLUSIONS OF LAW</u>

1.  The agents properly entered 34 Harris Street to execute
the arrest warrant for the defendant.  <u>See</u> <u>United States v.</u>
<u>Weems</u>, 322 F.3d 18, 22 (1st Cir. 2003).

2.  The agents were justified in conducting a protective
sweep of the apartment at the time that they made the arrest.
<u>See</u> <u>Maryland v. Buie</u>, 494 U.S. 325, 327 (1990) (holding that

police are permitted to conduct "a quick and limited search of the premises, incident to an arrest" to determine whether additional persons hidden there pose a threat to the officers and others on the scene).  The scale was observed in plain view in a glass cabinet in the living room during a legitimate protective sweep.  See United States v. Lewis, 40 F.3d 1325, 1334 (1st Cir. 1994)(describing plain view doctrine).

3.  The agents lawfully secured the premises while they awaited a search warrant.  The police had probable cause to believe that the premises contained evidence of a crime; had good reason to fear destruction of the evidence absent the freeze; made reasonable efforts to reconcile their needs with privacy interests; and imposed the restraint for a limited period of time.  Illinois v. McArthur, 531 U.S. 326, 331-32 (2001).  In addition, the police made reasonable efforts to secure the second floor several hours later because the search warrant had not yet arrived.  Defendant's relatives lived in the adjacent building and the police reasonably believed they could have access to the defendant's apartment.  While the police knew that some form of barricade blocked access to the adjacent apartment, the police did not know how secure the barricade was, and the search warrant was taking a long time to arrive.  Here, police properly "made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy."  Id. at 332.  Posting guards at the top of the main staircase was less intrusive than fully

7

investigating the attic staircase.  The restraint was properly limited in time and scope, as required.  Id. at 332-33.  These guards saw at least one bullet in plain view from their location in the second floor hallway.

    4.  The police justify the subsequent search of the property for a gun on the ground that they were trying to protect public safety.  This argument is not persuasive because the police had the house surrounded and there was little-to-no risk that any members of the neighborhood would have had access to the gun on the roof or the yard.  The pictures of the gun on the roof did not persuasively show that the gun was in plain view from the neighbors' houses or the public way.[3]  Even without reference to the handgun, though, the affidavit contained sufficient facts – especially the drug scale and ammunition – to support issuance of the search warrant.  Accordingly, the handgun and additional ammunition on the roof would have been discovered anyway.

    The inevitable discovery rule provides that "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then . . . the evidence should be received."  Nix v. Williams, 467 U.S. 431, 444 (1984).  See

---

[3] The government also argues that defendant had no privacy interest in the gun because he abandoned it when he threw it on the roof where neighbors could view it.  Again, the visibility of the gun from the neighbors' houses is not clear.

8

Murray vs. United States, 487 U.S. 533, 539 (1988) (discussing
the close relationship between the inevitable discovery doctrine
and the independent source doctrine).  Application of this rule
to the review of a warrant which contains information obtained
pursuant to an illegal search raises two questions: "'whether the
agents' decision to seek the warrant was prompted by what they
had seen during their initial entry' and (2) whether the
affidavit contained sufficient facts to support probable cause
when the offending facts were excised." United States v.
Dessesaure, 429 F.3d 359, 367 (1st Cir. 2005) (citing Murray, 487
U.S. at 542); see also United States v. Ford, 22 F.3d 374, 377
(1st Cir. 1994).

     First, the evidence demonstrates that the agents would have
sought the warrant absent discovery of the handgun and
ammunition.  They were already seeking the warrant when the
discovery was made, as they told Alexis Nguyen.  See Dessesaure,
429 F.3d at 369-70 (finding independent decision to seek warrant
where police informed suspect that they were going to apply for
warrant).  Moreover, the affidavit contained sufficient
information without the allegedly tainted information to support
probable cause.  Id. at 367-368 (applying Murray and finding that
affidavit contained sufficient information to support probable
cause even after excising all illegally obtained evidence).
Most significantly, the scale was evidence of drug dealing
activity and, along with the other information in the affidavit,

would have justified issuance of the warrant to search for further drug evidence.  <u>Cf.</u> <u>United States v. Des Marais</u>, 938 F.2d 347, 352 (1st Cir. 1991) (presence of triple-beam scale, along with other drug paraphernalia, supported inference of drug distribution by jury).  The defendant had already been indicted on a significant drug distribution charge and lived at that address.  <u>See</u> <u>United States v. Feliz</u>, 182 F.3d 82, 87-88 (1st Cir. 1999) (finding probable cause to search drug defendant's home because it was "a likely place to seek to find incriminating items").  Moreover, the police saw at least one bullet in plain view from the guard post in the hallway.  Accordingly, even without reference to the handgun, the warrant would have been sufficient.  <u>See</u> <u>Dessesaure</u>, 429 F.3d at 370.

### **ORDER**

The motion to suppress (Docket No. 30) is **<u>DENIED</u>**.

<u>S/PATTI B. SARIS</u>
United States District Judge